UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------x
NAHSHON JACKSON,

                     Plaintiff,          REPORT & RECOMMENDATION

           -against-            97 Civ. 7149 (GBD)(MHD)

GLEN S. GOORD, GEORGE J.
BARTLETT, CHRISTOPHER P. ARTUZ, :
R. SEITZ, A. PELC, GEORGE SMITH,
MCLEAN, LYNN FORGIT, J.P. :
REILLY, HENNESSEY, and SHAMBO,

                Defendants.
---------------------------------x

TO THE HONORABLE GEORGE B. DANIELS, U.S.D.J.:

      Plaintiff Nahshon Jackson, an inmate in the New York State correctional system, filed this lawsuit in 1997 against a number of correctional staff and officials at Green Haven Correctional Facility ("Green Haven"). He alleged that defendants had violated his constitutional rights because (1) he was exposed to a host of toxic and dangerous environmental conditions in the prison, (2) he was denied adequate medical care for various maladies, (3) he was denied due process in a disciplinary hearing, (4) he was sexually assaulted by a prison officer, (5) his legal dictionary was improperly confiscated from him, and (6) he was improperly removed from his work site at the prison.

      Following the completion of discovery, defendants filed a motion for summary judgment, and on August 30, 2005, the District

1

Court adopted our Report and Recommendation, granting summary judgment for defendants with respect to all of plaintiff's claims except for his environmental claims against defendants Christopher P. Artuz, George Smith, James P. Reilly, and Dick Hennessey, and his failure-to-treat claim against one defendant, Lynn Forgit. Defendants subsequently filed a supplemental motion for summary judgment on the environmental claims. Plaintiff opposes the motion.

For the reasons that follow, we recommend that defendants' motion be denied.

## Plaintiff's Environmental Claims -- Prior Proceedings

Plaintiff alleges harm from a host of environmental problems at Green Haven. His major environmental complaints are of (1) exposure to harmful chemicals through his work assignment at the auto body shop, (2) asbestos exposure in an area in Green Haven known as the J-School, (3) conditions in his cell, including bacteria in the ventilation system, (4) contamination of the drinking water, and (5) cigarette smoke exposure in the medical holding cell. (Compl. ¶¶ 13-23, 29, 31, 33-35, 36-39).[1]

_____

[1] Plaintiff's other claims in his complaint are summarized in our Report and Recommendation on defendants' initial summary-judgment motion. (Report and Recommendation dated July 7, 2005 ("R&R") 2-9).

2

In arguing for summary judgment on the environmental claims in their first motion, defendants proffered affidavits from Green Haven officials concerning the conditions in the auto body shop, some documents relating to the testing of Green Haven's water supply, and plaintiff's deposition testimony. (R&R 39). In recommending denial of summary judgment on these claims, we found that plaintiff's deposition testimony demonstrated the existence of triable disputes as to material facts about the conditions to which plaintiff was subjected in the auto body shop. (Id. at 46). As to the other environmental claims, we noted that in defendants' moving papers they had simply asserted, without explanation, that plaintiff could not "substantiate that any of the claims rise to the level of Eighth Amendment violations," that they had failed to point to anything in the record that would demonstrate the absence of a triable issue with respect to those claims, and that plaintiff's testimony demonstrated triable issues with respect to some or all of the claims. (Id. at 43-44). The District Court adopted our Report and Recommendation on August 8, 2005.

On August 25, 2005, defendants submitted a letter to the court requesting permission to file a supplemental motion for summary judgment to address the environmental claims. (Aug. 25, 2005 letter to the Hon. George B. Daniels from Assistant Att'y General Christine A. Ryan). Defendants stated that the previous summary-

3

judgment motion had been filed by an attorney who was no longer
with the office and that they could further develop the record to
dispose of the claims before trial. (Id.). The court denied this
request on August 30, 2005, and issued an amended order adopting
our Report and Recommendation on that same day.

The court subsequently held a conference with the parties on
April 12, 2007 in which defendants renewed their request to submit
a supplemental summary judgment motion. (Tr. 2-3). The court
granted this request, referring the motion to us. (Id. at 3).
During the conference, plaintiff objected to the request, saying
that he would be prejudiced because the case had been pending for
many years, and because he had lost some of his papers in the
course of being moved around to different prisons. (Id. at 5-6).
The court told plaintiff that he could bring up those arguments in
his response to the supplemental motion. (Id. at 6).

Following a telephone conference with the parties, we issued
an order directing defendants to serve and file their renewed
summary judgment motion, (a) presenting any additional arguments
and evidence they have, (b) addressing their failure to include
such information in their original motion, and (c) discussing why
they should be permitted to submit a supplemental motion. (Order
dated May 3, 2007). The order also stated that plaintiff may

4

address any prejudice that may result from defendants' filing of the motion in his response. (Id.).

## The Supplemental Motion

In their supplemental motion, defendants argue (1) that plaintiff has failed to show that the environmental conditions of which he complains rise to the level of an Eighth Amendment violation, and (2) that defendant Artuz was not personally involved in any constitutional violation and therefore the remaining claims against him should be dismissed. In support of their motion, defendants submit six additional affidavits from Department of Correctional Services ("DOCS") personnel, and resubmit some water inspection records and plaintiff's medical records.

Plaintiff opposes the motion, arguing (1) that the filing of the supplemental motion amounts to a motion for reconsideration and that defendants do not show grounds justifying reconsideration, (2) that the declarations submitted with the motion do not contain any new evidence and make false representations, and that there remain genuine issues of material fact as to the environmental claims, and (3) that he has proffered sufficient evidence to demonstrate a genuine issue of material fact on the personal involvement of defendant Artuz. In addition to his own affidavit, he submits the

5

affidavit of Randolf Rossi, an inmate who worked with plaintiff in the auto body shop at Green Haven and who testifies about the conditions in the shop. (Aff. of NahShon Jackson, executed Jun. 28, 2007 ("Jackson Aff. 2") Ex. C).

## ANALYSIS

### I. Supplemental Motion Filing Standards

Plaintiff argues that the current supplemental motion amounts to a motion for reconsideration of the court's earlier decision partially denying defendants' previous motion for summary judgment, and that since the submitted papers do not meet the requirements for a filing of such a motion, the motion should not be considered. (Id. at ¶¶ 4-5).

Despite being directed in our order to explain both their failure to include the supplemental information in their original summary judgment motion and the reasons why they should be permitted to submit the current motion, defendants did not address those issues in their initial memorandum. However, in their reply memorandum, they explain their conduct by stating that the attorney who filed the original motion is no longer with their office, and that he or she neglected to file affidavits containing sufficient

6

information regarding the environmental claims. (Defs.' Reply Mem. 3-4). They argue that "they should not be penalized for their former attorney's failure to provide sufficient factual support for these arguments in their opening motion." (Id. at 4).

"A motion for reconsideration will be granted by a district court only where the court has 'overlooked matters or controlling decisions which, had they been considered, might reasonably have altered the result reached by the court.'" Campbell v. Cantor Fitzgerald & Co., Inc., 205 F.3d 1321, 1321 (2d Cir. 1999) (quoting Adams v. United States, 686 F. Supp. 417, 418 (S.D.N.Y. 1988)); see also Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995); Local Civil Rule 6.3 ("There shall be served with the notice of motion [for reconsideration] a memorandum setting forth concisely the matters or controlling decisions which counsel believes the court has overlooked."). Reconsideration is not lightly granted:

Reconsideration of a previous order by the court is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources. A motion for reconsideration may not be used to advance new facts, issues or arguments not previously presented to the Court, nor may it be used as a vehicle for relitigating issues already decided by the Court. The major grounds justifying reconsideration are an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.

RST (2005) Inc. v. Research in Motion Ltd., 597 F. Supp. 2d 362, 365 (S.D.N.Y. 2009) (internal quotations omitted); see Chang v.

United States, 250 F.3d 79, 86 n.2 (2d Cir. 2001).

Plaintiff correctly notes that under this standard, defendants' additional submissions should not be considered by this court, as the information they present was available at the time of the filing of the original motion and they give what is at best a flimsy explanation as to why their office neglected to submit the information the first time. See United States v. Billini, 2006 WL 3457834, at *1-2 (S.D.N.Y. Nov. 22, 2006) (denying motion for reconsideration where, inter alia, "request for reconsideration rests entirely on new theories, arguments, and facts that were not previously presented to the Court" and there was no argument "that the evidence contained in [the supplemental] affidavit was not previously available to [the party] or could not have been obtained through diligent efforts.").

Defendants label their submission as a "Supplemental Motion for Summary Judgment," and district courts have wide discretion to allow such supplemental filings. Hill v. Rayboy-Brauestein, 2008 WL 231439, at *2-3 (S.D.N.Y. Jan. 24, 2008) ("There can be no doubt that district courts have authority to permit parties to file supplemental summary judgment motions"). Nonetheless, courts typically judge whether to grant leave to file a supplemental motion based on criteria similar to those governing motions for

8

reconsideration. Those include whether there has been a change in the law, or whether new evidence has come to light that was not previously available. Id. (change in the law); Mendoza v. Goord, 2002 WL 31654855, at *1 (S.D.N.Y. Nov. 21, 2002) (same); Heath v. Saddlemire, 2002 WL 31242204, at *1 (N.D.N.Y. Oct. 7, 2002) (same).

Even if we were to deem defendants' submission a supplemental motion rather than a motion for reconsideration, we still must exercise our discretion in deciding whether to address its substantive arguments. In making this decision, we consider the strong interests of judicial efficiency, finality, and scarce judicial resources discussed by the courts in setting the standards for motions for reconsideration, as well as any prejudice to the plaintiff in having to respond to an additional motion and having his case further delayed. See RST (2005) Inc., 597 F. Supp. 2d at 365; Discovision Assocs. v. Toshiba Corp., 2009 WL 1904518, at *1 (S.D.N.Y. June 30, 2009). As noted, defendants do not cite any change in the law or new evidence that was unavailable to them at the time of their original motion, and we do not find defendants' bare-boned reasons for filing their supplemental motion and the scant amount of additional information they have provided sufficiently compelling to balance the interests discussed above. Given these considerations, we recommend denying defendants' supplemental motion on these grounds. In any event, as an

9

alternative matter, we address the merits of their motion and recommend its denial on its merits.[2]

## II. Summary Judgment Standard

The court may enter summary judgment only if it concludes that there is no genuine dispute as to the material facts and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Shade v. Hous. Auth. of the City of New Haven, 251 F.3d 307, 314 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). It is axiomatic that the responsibility of the court in deciding a summary-judgment motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d

---

[2] We note that even if the motion were granted, this case would still have to proceed to trial on plaintiff's failure-to-treat claims against defendant Lynn Forgit. (See R&R 75).

10

9, 11 (2d Cir. 1986); see, e.g., Anderson, 477 U.S. at 255; Howley v. Town of Stratford, 217 F.3d 141, 150-51 (2d Cir. 2000).

The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the "pleadings, the discovery and disclosure materials on file, and any affidavits" that demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); see, e.g., Celotex, 477 U.S. at 322; Koch v. Town of Brattleboro, 287 F.3d 162, 165 (2d Cir. 2002). If the non-moving party has the burden of proof on a specific issue, the movant may satisfy its initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. See, e.g., Celotex, 477 U.S. at 322-23, 325; PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002); Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). If the movant fails to meet its initial burden, the motion will fail even if the opponent does not submit any evidentiary materials to establish a genuine factual issue for trial. See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 161 (1970); Giannullo v. City of New York, 322 F.3d 139, 140-41 (2d Cir. 2003).

If the moving party carries its initial burden, the opposing party must then shoulder the burden of demonstrating a genuine

11

issue of material fact. <u>See</u>, <u>e.g.</u>, <u>Beard v. Banks</u>, 548 U.S. 521, 529 (2006); <u>Celotex</u>, 477 U.S. at 322; <u>Santos v. Murdock</u>, 243 F.3d 681, 683 (2d Cir. 2001). In doing so, the opposing party cannot rest "merely on allegations or denials" of the factual assertions of the movant, Fed. R. Civ. P. 56(e); <u>see</u>, <u>e.g.</u>, <u>Amaker v. Foley</u>, 274 F.3d 677, 680-81 (2d Cir. 2001), nor can it rely on its pleadings or on merely conclusory factual allegations. <u>See</u>, <u>e.g.</u>, <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000). It must also "do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986); <u>see</u> <u>also</u> <u>Woodman v. WWOR-TV, Inc.</u>, 411 F.3d 69, 75 (2d Cir. 2005). Rather, it must present specific evidence in support of its contention that there is a genuine dispute as to the material facts. <u>See</u>, <u>e.g.</u>, <u>Celotex</u>, 477 U.S. at 324; <u>Scotto v. Almenas</u>, 143 F.3d 105, 114 (2d Cir. 1998); <u>Rexnord Holdings, Inc. v. Bidermann</u>, 21 F.3d 522, 526 (2d Cir. 1994).

In order to show a "genuine dispute" of material fact, the opposing party must demonstrate that there is sufficient evidence for a reasonable jury to find in its favor. <u>Anderson</u>, 477 U.S. at 248; <u>Matsushita</u>, 475 U.S. at 587; <u>Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.</u>, 473 F.3d 450, 455-56 (2d Cir. 2007) (citing <u>Anderson</u>, 477 U.S. at 249). If "the party opposing summary

12

judgment propounds a reasonable conflicting interpretation of [the] material disputed fact[s]," summary judgment must be denied. Schering Corp. v. Home Ins. Co., 712 F.2d 4, 9-10 (2d Cir. 1983).

## III. Environmental Claims

Defendants argue that none of plaintiff's environmental claims are serious enough to rise to the level of an Eighth Amendment violation. (Defs.' Mem. 9-10). They also argue that none of the conditions posed an unreasonable risk of serious damage to plaintiff's health, and that defendants' state of mind did not amount to deliberate indifference. (Defs.' Mem. 14). We address each of these claims in turn after discussing the standards for an Eighth Amendment violation.[3]

## A. The Eighth Amendment

Prison officials' liability for confinement conditions is governed by the Eighth Amendment and is determined by a two-part test. Farmer v. Brennan, 511 U.S. 825, 834 (1994). First, "the deprivation alleged must be, objectively, sufficiently serious . .

---

[3] We assume familiarity with the evidence and analysis of these claims recounted in our prior Report and Recommendation. (See R&R 3-5, 35-46).

13

. [and] a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." Id. Second, "a prison official must have a sufficiently culpable state of mind." Id.; see also Trammell v. Keane, 338 F.3d 155, 161 (2d Cir. 2003); Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2001).

Under the objective element of the test, the measure of a "sufficiently serious" deprivation is "contextual and responsive to contemporary standards of decency." Hudson v. McMillian, 503 U.S. 1, 8 (1992) (citing Estelle v. Gamble, 429 U.S. 97, 103 (1976)). As the Supreme Court stated in DeShaney v. Winnebago County Dep't of Social Services, 489 U.S. 189, 199 (1989):

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being . . . [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs -- e.g., food, clothing, shelter, medical care, and reasonable safety -- it transgresses the substantive limits on state action set by the Eighth Amendment. . . .

Id. at 199-200 (internal citations omitted). "[F]or a claim . . . based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." Farmer, 511 U.S. at 834. A prisoner need not show actual injury, as "the Eighth Amendment protects against sufficiently imminent dangers as well as current unnecessary and wanton

14

infliction of pain and suffering." Helling v. McKinney, 509 U.S. 25, 34 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.").

As noted in our previous Report and Recommendation, the Eighth Amendment inquiry in plaintiff's case focuses on the danger posed by the material itself -- that is, whether the nature and levels of plaintiff's exposure to toxic or noxious substances was such as to pose "an unreasonable risk" of serious damage to the health of any inmate exposed to it. Helling, 509 U.S. at 36. This requires a fact-finder to assess

> the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [the toxin] . . . [and] whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk.

Id. (emphasis in original).

Under the subjective test, a prison official must act with "'deliberate indifference' to inmate health or safety." Farmer, 511 U.S. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 302-03 (1991)). This means that "a prison official must know of and disregard an excessive risk to inmate health or safety; the official must . . . be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, . .

15

. draw the inference and fail to take reasonable measures to abate it." Trammell, 338 F.3d at 164 (citing Farmer, 511 U.S. at 837, 847); see also Phelps v. Kapnolas, 308 F.3d 180, 185-86 (2d Cir. 2002) (citing Farmer, 511 U.S. at 837). This element "entails something more than mere negligence . . . but something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996) (citing Farmer, 511 U.S. at 835). Plaintiff need not show actual knowledge of the risk of harm, but rather can

present[] evidence showing that a substantial risk . . . was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it.

Farmer, 511 U.S. at 842.

Finally, we note that plaintiffs in section 1983 actions are "entitled to an award of nominal damages upon proof of a violation of a substantive constitutional right even in the absence of actual compensable injury." Amato v. City of Saratoga Springs, 170 F.3d 311, 317 (2d Cir. 1999) (citing Smith v. Coughlin, 748 F.2d 783, 789 (2d Cir. 1984)); see Patterson v. City of Utica, 370 F.3d 322, 337 (2d Cir. 2004); Gibeau v. Nellis, 18 F.3d 107, 111 (2d Cir. 1994). Thus, if plaintiff can establish that the levels of alleged exposure to toxic substances at Green Haven posed a significant risk of serious harm, then he will have proven an Eighth-Amendment

16

violation and be entitled at least to nominal damages.

## B. The Specific Environmental Claims

### i. The Auto Body Shop

Plaintiff asserts that he was exposed to toxic chemicals and fumes while working in the Green Haven auto body shop, that he was not given proper safety instructions or equipment while working in the shop, that the shop's ventilation system was inadequate, and that these conditions created a serious risk to his health. (Defs.' Notice of Mot. dated Mar. 31, 2000, Ex. Q ("Dep.") 19-33; Aff. of NahShon Jackson, dated May 9, 2000 ("Jackson Aff. 1") ¶¶ 10-14; Compl. ¶¶ 13-23). In addressing plaintiff's auto body shop claims in their first set of summary-judgment papers, defendants proffered affidavits of three prison officials -- George Smith, the Senior Industrial Superintendent at Green Haven; James P. Reilly, the first officer in charge of the shop; and Dick Hennessey, the second officer in charge of the shop. These officials' testimony principally asserted that plaintiff had signed a safety precaution form and that generally the inmates were required to use safety equipment. (R&R 40-43). The court denied summary judgment for defendants on this claim, as we found "an existence of triable disputes as to the material facts" based on the contradictions

17

between the officials' testimony and plaintiff's testimony about
the shop's conditions. (Id. at 44-46).

In support of their supplemental motion, defendants proffer
two additional declarations on this issue, from William Tardella,
General Industrial Training Supervisor at Green Haven, and Arthur
Patterson, Industrial Training Supervisor at Green Haven, both of
whom testify about the general operation and safety procedures of
the Green Haven auto body shop.

Tardella testifies that the shop had doors and windows that
opened as well as a fan in the back wall of the shop to ventilate
the area, that safety standards are taught to inmates prior to
their beginning work at the shop, that inmates had access to
"Material Data Safety Sheets" that listed "what the items they were
working with contained," and that safety equipment and showers were
available to the inmates working in the shop. (Decl. of William
Tardella, executed on June 5, 2007 ("Tardella Decl.") ¶¶ 10-12, 17-
20). Tardella further states that jumpsuits and showers were
provided to inmates, and that "[a]lthough they were not mandatory,
all the inmates took advantage of them so that they did not have to
shower back at their cells and the jumpsuits kept them clean while
they worked in the auto body shop." (Id. at ¶ 20).

18

Patterson also discusses the safety procedures in the shop, testifying that safety instructions were given to inmates, that each inmate had his own mask, and that working in the spray booths was not dangerous because the inmates wore masks and because the booths were ventilated. (Decl. of Arthur Patterson, executed June 6, 2007 ("Patterson Decl.") ¶¶ 15, 18-21). He further states that representatives from the New York State Department of Labor visited the shop to assess compliance with regulations, and that the Superintendent and Assistant Superintendent of Industry at Green Haven visited the shop regularly, though he does not state in what time period these visits occurred, and whether these visits found any problems with the shop. (Id. at ¶¶ 16-17).

Plaintiff responds by asserting that defendants have not produced any new evidence regarding the conditions of the auto body shop, and also submits the affidavit of Randolph Rossi, an inmate who also worked in the shop. Rossi testifies that the prisoners were "made to sign a document stating that [they] were informed of the safety precautions even though [they] were never formally required to attend or participate in any" training classes, and that they also were never given any instruction or told to read the "Material Data Sheets." (Aff. of Randolph Rossi, executed June 28, 2007 ("Rossi Aff.") ¶¶ 6-7). He also states that the inmates wore doctors' masks while working with toxic chemicals, that he was

19

given a respirator mask but that the mask still let in fumes, and that the shop windows were closed in the wintertime to conserve heat in the shop, a claim that plaintiff also made in a previous affidavit. (Id. at ¶¶ 8-13; Jackson Aff. 1 ¶ 13). Finally, Rossi states that he did not recall ever seeing the Superintendent or Assistant Superintendent of Industry visit the shop. (Rossi Aff. ¶ 14).

The two declarations submitted by defendants add only a scintilla of additional evidence with regard to the auto body shop conditions, and defendants still do not meet their burden for summary judgment. The declarations repeat in large part the assertions made by Smith, Reilly, and Hennessey about the general safety procedures at the auto body shop with regard to ventilation and equipment, and the only new information they provide is the reference to the inmates' access to "Material Data Safety Sheets" and the visits from officials to determine compliance. Notably, neither Tardella nor Patterson profess any knowledge of plaintiff's work conditions in the auto body shop in particular, and Tardella specifically states, "I do not recall plaintiff Nahshon Jackson." (Tardella Decl. ¶ 21).[4]

---

[4] Tardella's statement that "all" of the inmates used the jumpsuits and showers despite their not being required (Tardella Aff. ¶ 20) does not reflect any personal knowledge of plaintiff's practices when he worked in the shop, and, regardless, contradicts plaintiff's testimony on this matter.

20

Furthermore, both plaintiff's and Rossi's testimony directly contradict these statements about the general safety procedures in the auto body shop. Plaintiff testified, inter alia, that he was not properly trained to work in the shop despite signing the safety form, that he was supplied with an inadequate mask while working with toxic chemicals, and that the fans and windows did not properly ventilate the shop. (Jackson Aff. 1 ¶¶ 12-14). Rossi repeats these assertions that the general safety procedures were not followed and were inadequate, as he testifies that the inmates were not informed about safety precautions or the Material Data Safety Sheets referred to by Tardella, that the masks they were given let in fumes, and that the windows were not always open to ventilate the rooms. (Rossi Aff. ¶¶ 6-8, 10-13). Additionally, in plaintiff's opposition to defendants' original summary-judgment motion, he submitted a written grievance form from another inmate, John Taylor, who complained that Reilly "deliberately failed to provide" Taylor with the necessary protective equipment while he was working in the auto body shop and that he was exposed to toxic chemicals as a result (Jackson Aff. 1 Ex. D), evidence that further supports plaintiff's claims that inmates were not given proper safety equipment and were not properly trained to handle toxic chemicals in the auto body shop. Thus there exists a genuine dispute of material fact between the parties as to the actual safety practices in the shop.

21

Defendants also assert that plaintiff's medical records "do not prove that [his alleged symptoms] were related to his work at the auto body shop." (Defs.' Mem. 13). To support this and other claims about plaintiff's medical conditions, defendants re-submit plaintiff's medical records, which they had submitted in support of their first motion, and offer the declaration of Tim Whelan, a Facility Health Services Director for DOCS who has not treated plaintiff. (Decl. of Tim Whelan, executed June 6, 2007 ("Whelan Decl.")). Aside from the fact that plaintiff is not required to "prove" his case in opposing a summary-judgment motion, the very parts of the medical records that defendants and Whelan cite contradict defendants' arguments on this point.

Plaintiff's medical records contain multiple notations that plaintiff complained about the conditions and fumes in the shop, including statements that his headaches got worse when he was in the shop, and that his headaches arose after a full day's work. (Whelan Decl. Ex. F ("Medical R.") 46, 47, 52, 53). Another entry details plaintiff's complaint that his feet had been exposed to chemicals while he was cleaning the auto body car paint room. (Id. at 44-45). Although defendants cite the entry in the medical records that day as indicating "no obvious distress" and "skin of both feet intact," these notations do not contradict plaintiff's claims that he was exposed to toxic chemicals or that he suffered

22

from serious medical symptoms as a result of that exposure. In
fact, plaintiff specifically testified in his deposition that the
conditions in the shop caused headaches, nosebleed, and nausea.
(Dep. 22-23, 26).

Defendants also argue that plaintiff has not established that
the chemicals in the auto body shop posed an unreasonable risk of
serious damage to his health. However, plaintiff also testified
that he was constantly exposed to "[r]ed putty, primer, paint,
fumes from vehicles, Bondo residue" (Dep. 19) and carbon monoxide
and "the buffing of wax" (Jackson Aff. 1 ¶ 13) in the shop, that he
was forced to wear a mask in the shop that had a warning label
stating that it could cause sickness or death if it was used for
industrial purposes (Dep. 21), that the toxicity of the materials
he was handling was confirmed by a prison official (id. at 25-26),
and that once the shop had to be closed down because of the
chemicals. (Id. at 31). Plaintiff also testified that he worked in
the shop for seven hours a day for an extended period of time. (Id.
at 37-38).

Defendants do not proffer any testimony containing personal
knowledge of plaintiff's specific work conditions, and also do not
proffer evidence of the level of toxicity of the materials with
which plaintiff worked. Thus a reasonable fact-finder could

23

conclude, based on plaintiff's testimony about his prolonged exposure to the harmful effects of the materials and the inadequacy of the safety equipment, that plaintiff was exposed to levels of toxins and chemicals that posed an unreasonable risk of serious damage to his immediate or future health. See, e.g., Helling, 509 U.S. at 34 (noting that inmates have been held to be "entitled to relief under the Eighth Amendment when they proved threats to personal safety from exposed electrical wiring, deficient firefighting measures, and the mingling of inmates with serious contagious diseases with other prison inmates.").

Therefore, the additional evidence proffered by defendants does not suffice to meet their burden to show an absence of dispute as to the material facts regarding the conditions in the auto body shop when plaintiff worked there or the risk that the toxic materials in the shop created.

ii. Asbestos

Plaintiff asserts that he was exposed to asbestos four to five hours a day while he was at the "J-School," an area at Green Haven that housed the law library, inmate organizations, and the counseling and physical therapy units. (Dep. 35-44; Jackson Aff. 1 ¶ 9; Compl. ¶ 29). He was notified of the asbestos exposure through

24

signs posted at the J-School as well as through prison officials and other prisoners, including prisoners who were doing asbestos abatement work at the J-School. (Dep. 38-40).

Defendants have not provided any evidence addressing plaintiff's asbestos claim in either their first motion for summary judgment or their supplemental filing. Their argument on their current motion regarding this claim states in full:

Although Plaintiff alleges that he was exposed to asbestos while at Green Haven (Complaint ¶ 29), he does not allege in his Complaint that he suffered any specific injury as a result of the alleged exposure. Furthermore, his medical records do not contain any indication that he complained of asbestos exposure, or that he believed that any of his alleged ailments were the result of asbestos exposure.

(Defs.' Supp. Mem. 11-12).

As we have noted, however, the lack of proof of injury is not dispositive of this claim, as plaintiff need not show an actual or present injury in order to bring an Eighth Amendment claim. See Farmer, 511 U.S. at 837. Further, the Second Circuit has held that asbestos exposure in prison can constitute a violation of the Eighth Amendment. LaBounty v. Coughlin, 137 F.3d 68, 74 (2d Cir. 1998). As defendants fail to provide any evidence disputing plaintiff's claim that he was exposed to asbestos for four to five hours a day over an extended period of time or his claim that there is a risk to his health as a result of this exposure, summary

25

judgment cannot be granted on this claim.


### iii. Plaintiff's Cell


Plaintiff complains about the conditions in his cell, alleging that the ventilation system was clogged with bacteria and black particles, that there was inadequate heating and hot water, and that there was a sewage drainpipe in front of his cell that discharged a foul odor. (Dep. 44-47; Jackson Aff. 1 ¶¶ 7, 16). He asserts that he sustained headaches, dizziness, foul odor, and nosebleed from the bacteria in his cell. (Jackson Aff. 1 ¶ 16; Compl. ¶ 31).


Again, defendants offer no evidence regarding these claims in either their initial or their supplemental motion, and the only argument they make on this claim in support of their supplemental motion is that "there is no indication in the medical records that [plaintiff] complained of any of these ailments with regard to the ventilation system." (Defs.' Mem. 12 (citing Whelan Decl. ¶ 16)). However, the record shows at least one entry in the medical records stating "c/o diarrhea - intermittent. States foul odor from ventilation system in cell and has reported it to security." (Medical R. 25). Further, the medical records generally are rife with plaintiff's complaints of headaches, dizziness, and

26

nosebleeds. (See, e.g., id. at 3, 8, 29, 3, 45-47, 53). Plaintiff also provided complaints from numerous inmates about headaches and other ailments resulting from poor ventilation in their cells in his opposition papers to defendants' original motion. (Jackson Aff. 1 Ex. B). Since defendants proffer no evidence with respect to plaintiff's complaints about his cell, and only misrepresent the record in their supplemental briefing, we again recommend denial of summary judgment on this claim.

### iv. Drinking Water

Plaintiff also complains that the drinking water in his cell was "highly contaminated," and that he personally observed that the water had brown particles in it and left large amounts of rust in his sink. (Compl. ¶ 33; Dep. 47-48). He asserts that he suffers from "diarrhea, skin rashes, fatigue, and other illnesses," symptoms that emerged only after he drank the contaminated water, and that other inmates also complained after drinking the water. (Compl. ¶ 35; Dep. 49-52). In support of his opposition to defendants' original motion, plaintiff submitted written complaints from himself and at least ten other inmates mentioning the water quality and complaining of physical ailments resulting from consuming the water, including headaches, rashes, diarrhea, vomiting, and body pains. (Jackson Aff. 1 Ex. B).

27

In support of their supplemental motion, defendants resubmit the water inspection records they submitted in their original motion. The records are attached to a declaration from Jeff Richards, the Plant Superintendent at Green Haven, who states that the records are "true and correct copies of water records for water tested at Green Haven from 1995 to 1996 which I have reviewed" but then states in the same paragraph that "[a]lthough I believe these records are true and correct, I am unable to certify these records because the original water records from those dates no longer exist, as it is Green Haven policy to retain records for a maximum of five years." (Decl. of Jeff Richards ("Richards Decl.") ¶ 5 & Ex. G). Richards further states that he and his employees always drank the water at Green Haven, that occasionally there was discoloration in the water from increased water flow disturbing sediment, which is harmless because it "is always present in the water," and that "[t]here were no serious incidents with the sewage system/water treatment while Plaintiff was at Green Haven." (Richards Decl. ¶¶ 6-7, 9-10).

Defendants face the same problems on this claim with their supplemental motion as they did with their original motion. (See R&R 44 n.10). The water inspection reports remain unauthenticated, as Richards specifically states that he is unable to certify them, and, more importantly, remain unexplained. It is still unclear how

28

the water was tested, whether the water tested was from the same
source as the water that was provided to plaintiff, and how
complete the submitted records are.[5] Moreover, the only additional
evidence that defendants present in support of their supplemental
motion on this claim is Richards' short declaration, but none of
his statements show an absence of a genuine issue of material fact
about the water quality. His statement that he and his employees
drink the water at Green Haven is irrelevant, as he does not offer
proof that they drank from the same water source as plaintiff, and
also does not state what their physical conditions were after
drinking the water. His statement that the increased sediment flow
in the water "is not harmful, since it is something that is always
present in the water" is unsupported by any evidence or explanation
of what expertise he has or on what he bases this opinion.

In light of the evidence presented by plaintiff from the
medical records, plaintiff's affidavits, and other inmates'
complaints, there remains a triable issue as to the quality of the
water and whether or not it posed a serious risk to plaintiff's
health. Accordingly, summary judgment must be denied on this claim.

_____

[5] We note that the water inspection records come only from
the years 1995 and 1996, and that plaintiff's claims cover a
longer period of time, as his complaint was filed in 1997, and he
testified in his deposition in 1998 that the water was still
contaminated. (Dep. 47-49).

29

v. Cigarette Smoke

Plaintiff's final environmental claim is that he was exposed multiple times to cigarette smoke in a medical holding pen. (Compl. ¶¶ 36-39; Dep. 98-99). In their supplemental motion, defendants point to fact that plaintiff's medical record reflects that he once complained that the smoke bothered his eyes, but that the entry says plaintiff was "in no obvious distress." (Defs.' Mem. 12). Defendants do not appear to make any legal argument with regard to this claim.[6]

Defendants have provided no additional evidence on this claim, and we again recommend denial of summary judgment. The courts have held that exposure to cigarette smoke can constitute an Eighth Amendment violation. Helling, 509 U.S. at 35; Warren v. Keane, 196 F.3d 330, 333 (2d Cir. 1999). Insofar as defendants are arguing that plaintiff's medical records do not support a claim of present harm based on exposure to cigarette smoke, we again note that the Eighth Amendment protects against imminent dangers as well as

---

[6] Defendants make an additional argument that although plaintiff claims that he does not smoke, he admitted in his deposition that he had purchased cigarettes. (Defs.' Mem. 12; Dep. 53). However, plaintiff also testified that he purchased the cigarettes for barter and not for personal consumption (Dep. 54), so there appears to be a question of fact as to whether or not plaintiff smoked. In short, defendants' argument on this point cannot justify summary judgment.

30

actual injury. Helling, 509 U.S. at 34.

## C. Substantial Risk of Serious Harm

Defendants also make a blanket statement at the end of their memorandum that "[p]laintiff has not established that the level of any alleged toxic chemical, smoke, asbestos, or contaminated water posed an unreasonable risk of serious damage to his health," arguing that plaintiff's symptoms are those "of a cold or a flu, or eye strain, and are clearly not conditions of urgency that may produce death, degeneration or extreme pain." (Defs.' Mem. 13-14).

This argument is dishonest, as well as plainly frivolous. As mentioned, the Supreme Court has found that exposure to toxic and unsafe substances can constitute an unreasonable risk of serious danger to an inmate's health. Helling, 509 U.S. at 33-34; see also Wright v. New York State Dep't of Corr. Servs., 2008 WL 5055660, at *10 (S.D.N.Y. Oct. 10, 2008) ("Exposure to unsafe levels of toxic substances, such as tobacco smoke or asbestos, may suffice as sufficiently dangerous conditions to satisfy the objective element of an Eighth Amendment claim."). Additionally, plaintiff's medical records for the relevant time period reflect frequent complaints about the numerous medical conditions he associates with his claims -- such as headaches, dizziness, shortness of breath, coughing,

31

difficulty breathing, diarrhea, and eyestrain. (Medical R. 3, 8, 22, 25, 29-30, 37, 39, 45-48, 50-53). The only evidence, medical or otherwise, that defendants submit to contradict plaintiff's claims about the potential danger of the environmental conditions of which he complains is Whelan's conclusory statement that "none of these factors posed an unreasonable risk to Mr. Jackson's health," and that "[i]t is clear that Mr. Jackson was not exposed to any of these agents at any level that could produce death, degeneration, or extreme pain or that posed an unreasonable risk of serious damage to his future health." (Whelan Decl. ¶¶ 35-36). However, Whelan does not explain how he has the personal knowledge to make such statements, as he does not claim to ever have worked at Green Haven, seen the auto body shop or other environments of which plaintiff complains, or met or treated plaintiff. Defendants' additional contention that plaintiff's symptoms are simply those of a cold or flu are unsupported by any medical opinion or proof.

Considering all the evidence presented by the parties, a reasonable fact-finder could find that plaintiff was exposed an unreasonable risk of serious harm from the environmental conditions of which he complains.

## D. Deliberate Indifference

Defendants also assert in a conclusory fashion that "nothing in the record indicates that Defendants knew that Plaintiff faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measure[s] to abate the risk." (Defs.' Mem. 14). As noted in our previous Report and Recommendation, defendants fail to carry their burden on a summary-judgment motion with such bare-bones statements without any reference to anything in the record that would demonstrate the absence of a triable issue. Summary-judgment on this issue should be denied. (See R&R 43-44).

## IV. Personal Involvement of Defendant Artuz

Defendants argue that defendant Christopher Artuz was not personally involved in any of plaintiff's environmental claims, and therefore the claims against him should be dismissed. (Defs.' Mem. 7-9). In support of this aspect of their supplemental motion, they offer the declaration of Artuz, in which he discusses his responsibilities and the general process for handling inmate letters. (Decl. of Christopher P. Artuz dated June 6, 2007 ("Artuz Decl.") ¶¶ 3-5). He further states that the Green Haven staff does not have (1) "any written letters addressed to [him] for the period

33

of 1995 and 1997" or (2) any grievances written by plaintiff between the same years, although he notes that the staff only retains grievances for four years plus the calendar year. (Id. at ¶¶ 6-7). He also states that he has no personal recollection of plaintiff. (Id. at ¶ 6).

Plaintiff alleges that Artuz was aware of the asbestos, poor ventilation in the cells, and the contaminated drinking water and its physical effects. (Compl. ¶¶ 30, 32-35). In support of that allegation, he testified that he had filed grievances with Artuz about his exposure to cigarette smoke, ventilation in his cell, and contaminated drinking water, and that Artuz did not respond to these grievances. (Dep. 46, 48, 91-92; Compl. ¶¶ 40-41, 57-58).

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (citing Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)). A supervisory official cannot be liable under the doctrine of respondeat superior. See, e.g., Al-Jundi v. Estate of Rockefeller, 885 F.2d 1060, 1065 (2d Cir. 1989). The requisite personal involvement may be shown by establishing one of five circumstances:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a

34

policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995); Jean-Laurent v. Wilkerson, 438 F. Supp. 2d 318, 325 (S.D.N.Y. 2006).

Based on plaintiff's assertions that Artuz received complaints from him and from a number of other inmates (Dep. 46, 48, 91-92; Compl. ¶¶ 40-41, 57-58; Jackson Aff. 1 Exs. B, D) and that Artuz was aware of the harmful environmental conditions, Artuz could be found to have been personally involved in the alleged violations under two of the Colon circumstances: (1) failure to remedy a wrong after being informed of the violation through a report or appeal, or (2) exhibition of deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. See, e.g., Blyden v. Mancusi, 186 F.3d 252, 264 (2d Cir. 1999) (finding that supervisors may be personally involved in a deprivation of rights by learning of a violation and failing to remedy it).[7]

---

[7] A question has arisen as to whether the traditional supervisory-liability test has been eviscerated by the recent Supreme Court decision in Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937 (2009). See, e.g., Martin A. Schwartz, Supreme Court Sets Standards For Civil Rights Complaints, N.Y.L.J., Aug. 3, 2009, at 3, 7 (stating that the Court "jettisoned the very concept of supervisory liability"). We do not believe that it has

The limited amount of information Artuz provides in his declaration is insufficient to meet his burden on a summary-judgment motion on this issue. Plaintiff has testified that he sent numerous grievances to Artuz that notified the Superintendent of the alleged ongoing constitutional violations. While Artuz states that he does not have any letters addressed to him or any record of grievances filed by plaintiff, he also states that any such documents would not have been retained by Green Haven under its record-keeping policies. (Artuz Decl. ¶¶ 6-7).[8] Necessarily, there is a genuine issue of material fact as to whether Artuz received any grievances from plaintiff, and what, if anything, he did in

_____

done so in the circumstance of this case. The claims by Iqbal involved, inter alia, denial of equal protection or discrimination -- legal theories that require proof of discriminatory intent. Iqbal, 129 S. Ct. at 1948 (citing Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. 520, 540-541 (1993) and Washington v. Davis, 426 U.S. 229, 240 (1976)). The Supreme Court held in Iqbal that even supervisors must be alleged and proven to have violated the plaintiff's underlying constitutional right to be held liable. See id. at 1949, 1952. Since the claims at issue in Iqbal involved discriminatory intent, the Court held that the plaintiff could not prevail by way of the traditional supervisory-liability test of deliberate indifference. Id. at 1949. In contrast, in this and many other prison-condition cases, the underlying constitutional right of the inmate is to be free of injurious deliberate indifference by their jailers. See, e.g., Erickson v. Pardus, 551 U.S. 89, 89 (2007); Sledge v. Kooi, 564 F.3d 105, 106 (2d Cir. 2009). In these cases, then, deliberate indifference by supervisors to known injury-causing conditions should still trigger liability.

[8] Since it is highly implausible that no letters were written to Artuz from 1995 to 1997, we assume that Green Haven follows a similar policy for letters as it does for grievances and had no longer retained any letters to Artuz from that period at the time defendants filed their supplemental motion.

36

response to those grievances.

More significantly, however, Artuz does not address in his declaration whether he had any knowledge or notice, from plaintiff or otherwise, of the alleged environmental problems. Based on the numerous inmate complaints about the problems that plaintiff has proffered as evidence, a reasonable trier of fact court find that Artuz knew of the ongoing constitutional violations and, as Superintendent, had the authority to correct the problems and failed to do so. See Hall v. Leclaire, 2007 WL 1470532, at *10 (S.D.N.Y. May 22, 2007), adopted in relevant part, 2007 WL 2815624 (S.D.N.Y. Sept. 28, 2007) ("An appropriate guiding principle" in determining whether an administrative action constitutes personal involvement "is that where a grievance alleges an ongoing constitutional violation, a supervisory defendant who reviews it is personally involved in that violation because he is confronted with a situation that he can remedy directly."). Thus whether or not Artuz was personally involved in the alleged constitutional violations remains a triable issue. Accordingly summary judgment on this claim should be denied.


                              CONCLUSION


     For the reasons stated, we recommend that defendants'

37

supplemental motion for summary judgment be denied in all respects.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable George B. Daniels, Room 410, 40 Centre Street, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals.  See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Secretary of Health and Human Services, 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: New York, New York
      August 6, 2009

                              Respectfully submitted,


                              MICHAEL H. DOLINGER
                              UNITED STATES MAGISTRATE JUDGE

38

Copies of the foregoing Memorandum and Order have been mailed today to:

Mr. NahShon Jackson
95-A-2578
Coxsackie Correctional Facility
P.O. Box 999
Coxsackie, NY 12051

Inna Reznik, Esq.
New York Attorney General's Office
120 Broadway, 24th floor
New York, NY 10271